PILLSBURY et al. v. PILLSBURY-WASHBURN FLOUR MILLS CO., Limited.

(Circuit Court of Appeals, Seventh Circuit. November 27, 1894.)

No. 193.

1. UNFAIR COMPETITION—COLORABLE IMITATION OF BRAND.

C. A. P. & Co. had for many years been engaged in manufacturing and selling flour which had acquired a high reputation and extensive sale. In 1872 they adopted a mark or brand which they applied to the packages containing their flour, consisting of the name P., the name of the place of manufacture, "M., Minn.," the letters "XXXX," and the word "Best," in large letters of a peculiar design, all arranged in a circular form, surrounded by two lines of dots, with the name P. in a vertical line at each side, the whole being printed in blue, except the word "Best," which was printed in red. The business of C. A. P. & Co., and the right to use such mark or brand, were sold in 1889 to complainant, a corporation organized and managed by the members of the firm, which continued the manufacture and sale of the flour and the use of the mark or brand. In 1893 defendant L. F. P. commenced, at a small town in Illinois, the business of buying flour and putting it up and selling it in packages on which he placed a mark or brand of similar form to that of complainant, in which the name L. F. P. was substituted for the name P. alone, in the same part of the circular device and in the vertical lines, the word "Minnesota" was substituted for "M., Minn.," the letters "XXXX" were placed above instead of below the word "Best," which was printed in letters of the same size but slightly different design from those on complainant's brand, the word "Patent" was added, and the lines of dots surrounding the circular device were increased to three; the whole, except the word "Best," being printed in blue, and the word "Best" in red. *Held,* that defendant's mark constituted a colorable imitation of complainant's mark, manifestly intended to dress up defendant's goods in the appearance of complainant's goods, and mislead the public into buying them as such, and that its use should be enjoined.

2. SAME—COMING INTO EQUITY WITH CLEAN HANDS.

*Held,* further, that even if the use of the mark by a corporation actually managed by a member of the firm which originally manufactured the flour and devised the mark could be considered a false representation as to the actual makers of the flour, the fact that prior to defendant's commencing business the corporation had begun to stamp all its packages with its own name, as "successor" to the former firm, obviated any objection on this ground to complainant's right to an injunction.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

This was a bill in equity, brought by the Pillsbury-Washburn Flour Mills Company, Limited, against L. F. Pillsbury and Ephraim Hewitt, to restrain the use by defendants of a mark or brand alleged to be a fraudulent imitation of complainant's brand. The circuit court made an order granting to complainant a preliminary injunction. Defendants appeal.

This is an appeal from the order of the court below passed on the 2d day of July, 1894, granting a writ of injunction, and the question is upon the validity of the restraints thereby imposed.

The bill filed by the appellee charges that the firm of Charles A. Pillsbury & Co. had for many years been engaged in the business of manufacturing, putting up, shipping, and selling flour and operating certain flour mills in the city of Minneapolis; that their flour had, by reason of its high and uniform grade and excellence of manufacture, acquired a great reputation, and was known and sold throughout the continents of America and Europe; that in 1872 the firm adopted a trade-name or brand for identifying their high grade of wheat flour, which consisted of a certain device of the words "Pillsbury's Best," which words and device were printed, branded, and marked upon the packages, sacks, and barrels of flour, of which brand the following is a facsimile:

The words "Pillsbury's XXXX, Minneapolis, Minn." were printed in blue ink, and the word "Best" in red ink, in large letters, having a position centrally across the head of the barrel or across the sack. That the flour, in the sale of which such trade-name was used, was flour manufactured at their mills from spring wheat of a very high grade or quality, the flour being manufactured by the "patent" process, which consists in subjecting the grain to the operation of successive rollers, whereby the external portions of the kernels of the grain are disintegrated, removed, and carried away successively, so as to leave the interior or core of the grain, containing the gluten, for disintegration last, the process being to first remove the husk of the grain, which is made into bran, shorts, and screenings, and then the exterior coatings of starch inside the hulls or husks, which are made into a cheap grade of flour, and finally to entirely and separately disintegrate the interior or gluten of the wheat and make it into a flour comprising from 45 to 50 per cent. of gluten and the balance starch. This last-named flour is known as the "patent process" flour, and is of a high grade and quality, highly nutritious, produces a white and fine quality of bread, and commands a high price. It was in connection with this quality of flour that the firm used the trade name and mark described, as a means of identifying the origin and manufacture of the flour by them.

By means of extensive advertising, and of the excellent quality of their product, their flour became extensively known in connection with such trade-name, and was commonly called in the trade "Pillsbury's Best" and "Pillsbury's Best XXXX" flour, and was ordered and sold under those names, which became substantive terms in connection with the word "Pillsbury," identifying the brand of flour manufactured, sold, and advertised by that firm.

In 1889 the appellee, complainant below, was incorporated, and succeeded

to the business of the firm of Charles A. Pillsbury & Co., and by purchase became the owner of the property, mills, machinery, trade-marks, trade-names, etc., theretofore used by the firm in their business, which it thereafter continued and now successfully prosecutes. The members of the firm of Charles A. Pillsbury & Co. became largely interested as shareholders in the corporation, and Mr. Charles A. Pillsbury, who had personal supervision of, and who had built up and established and conducted the business of, the former firm, immediately became, continued to be, and is now managing director of the corporation, and conducts, controls, and regulates its business to the same extent and in the same manner as he conducted, controlled, and regulated the business of Charles A. Pillsbury & Co. The corporation has continued to use the same trade-name and brand upon its product that were used by the old firm, and prior to this suit placed upon the sacks containing its flour so manufactured and identified by the trade-names mentioned the words "Pillsbury-Washburn Flour Mills Company, Ltd., Successors to," above the monogram "C. A. P. & Co.," that had been used by the firm of Charles A. Pillsbury & Co. upon their packages of flour.

The bill further charges that in 1893 L. F. Pillsbury, one of the appellants, then residing in the village of La Grange, Cook county, Ill., who has never been engaged in the business of milling or manufacture of flour, fraudulently conceived the plan and idea of using, allowing, and selling the use of his name "Pillsbury," and of selling flour with a simulated trade-name that would deceive and fraudulently induce the public to purchase his flour as the flour of the appellee, and pursuant thereto began to sell flour and feed in this suburban village of La Grange, and for a few months carried on a small retail business thereat, purchasing flour, which he put into sacks branded with the trade-name or trade-mark, a facsimile of which is as follows:

—The words "L. F. Pillsbury XXXX," "patent." "Minnesota," being printed in blue ink, and the word "Best" in red ink, and in large letters.

It is charged that the flour, which he purchased from various dealers, was of inferior grade to the product of the appellee so known and identified by its trade-name, and that he fraudulently used that name upon the sacks with the design and intent of deceiving the public into the belief that the flour so sold by him was the product of the mills of the appellee; that he was a man without capital, had no mill, and was never the owner or proprietor of or interested in any mill for the manufacture of flour, and that his plan was simply a false and fraudulent scheme to impose upon the public, and to palm off his flour as the flour manufactured by the appellee; that in the beginning of the year 1894 L. F. Pillsbury ceased to do business at La Grange, and entered into a contract with the appellant Ephraim Hewitt, who was a wholesale dealer in flour in the city of Chicago, whereby, for a certain royalty or commission upon sales, L. F. Pillsbury permits Hewitt to use his false and simulated brand and trade-name upon barrels and sacks of flour which Hewitt may have for sale, not of the appellee's manufacture, but purchased from various mills and millers, some of which are not located in the state of Minnesota, and which flour is of a quality and grade inferior to that of the appellee; that the appellants extensively advertise and sell flour under the names of "L. F. Pillsbury's Best," "Pillsbury's Best," and "Pillsbury's Best XXXX," and have entered into contracts with wholesale and retail dealers in flour by which they are selling spurious flour put up in sacks and barrels bearing the simulated brand, and delivered with the understanding that the purchaser shall resell the same as the true and genuine flour manufactured by appellee, and that such dealers have succeeded in and are now selling false and spurious flour as the genuine "Pillsbury's Best" or "Pillsbury's Best XXXX" flour manufactured by appellee, and, because of its inferior quality, at a less price than the appellee can afford to sell its product.

The answer of the appellants, so far as it relates to their transactions, asserts that L. F. Pillsbury was engaged in buying and selling flour at La Grange for some time prior to the 15th of November, 1893, but for what length of time prior to that date it does not state; that while so engaged he invented a brand or trade-name of which a facsimile has been exhibited, and built up a considerable trade in his brand of flour; that being in want of the necessary capital to conduct the business, and believing that the city of Chicago would be a much more desirable point at which to handle flour than the village of La Grange, at that date he entered into an agreement with his co-defendant, Hewitt, to enter into the business of buying and selling flour, and that thereafter they continued to sell flour put up in sacks, barrels, and packages with the brand thereon of which the facsimile is above given. They deny that the agreement is a scheme or device to interfere with any trademark or brand of the business of complainant, but "aver and charge the fact to be true that they are advised that they had the right to make the agreement, and put up and handle flour as aforesaid." They deny that they have offered for sale or sold an article of flour in imitation of the flour of complainant to deceive customers or to injure the complainant, and allege that they "have always stated and made known to their customers that said flour so handled by them under said brand is not the flour of said complainant, but is a flour put up under said brand by themselves, manufactured from Minnesota wheat, and that said flour, in their judgment, is equal to, if not superior to, that sold by "Pillsbury-Washburn Flour Mills Company, Limited." They assert that no person can be deceived by their brand into the belief that it is the flour of complainant; that the brand used by them is so dissimilar to the brand used by said complainant that it will arrest the attention of the most casual observer; that the formation of the letters in the word "Best" are different, and "that the general arrangement of said brand is so dissimilar from that of the complainant that the most casual observer can readily see there is no similarity between the devices used by these defendants and the said complainant." They further assert that one side of the sacks used by them is entirely plain, while both sides of the sacks used by the appellee are covered with words, letters, and brands. They assert their right to deal thus in flour under the brand and trade-name which they are using; that the name

"Pillsbury" cannot be appropriated by the appellee so as to deprive L. F. Pillsbury of making any lawful use thereof, or placing the flour upon the market by the device shown. They allege that all of the flour put up and sold by them is made of the best quality of wheat grown in Minnesota or adjoining states, and manufactured by millers located in Minnesota, and is, in their judgment, a flour superior to that manufactured by the complainant.

The motion for a writ of injunction was heard upon the pleadings and upon numerous affidavits, upon which hearing the court below ordered the issuance of a writ of injunction restraining the appellants until the final hearing "from putting up, shipping, and delivering any flour in packages, barrels, sacks, bags, and other receptacles bearing the aforesaid trade-mark, trade-name, or brand, 'Exhibit I' of said complainant, or any colorable imitation thereof, and from manufacturing, putting up, shipping, and delivering any flour in packages, barrels, sacks, bags, or other receptacles bearing the aforesaid trade-mark, trade-name, or brand of said defendant, or any colorable or deceptive imitation thereof; and from dressing up flour in packages, sacks, or bags so as to resemble the packages, sacks, and bags used by complainant; and from selling, palming off, or representing the flour contained in any such sack, bag, barrel, or receptacle as the flour of complainant."

John P. Hand, Thomas E. Milchrist, and Ben M. Smith, for appellants.

Frank F. Reed, Clarence S. Brown, and Harry K. Allen, for appellee.

Before WOODS and JENKINS, Circuit Judges, and GROSSCUP, District Judge.

JENKINS, Circuit Judge, after statement of the case, delivered the opinion of the court.

The right of appellees to relief is not rested upon any notion of right to or property in a technical trade-mark, but upon principles applied by courts of equity in cases analogous to cases of trademarks, where the relief is afforded upon the ground of fraud, which in turn rests upon the hypothesis that the party proceeded against had deliberately sought to deceive the public, and to defraud another by palming off his own goods as the goods of that other. The general principles by which courts are guided in such cases are well and correctly stated in Cement Co. v. Le Page, 147 Mass. 206, 208, 17 N. E. 304, as follows:

"A person cannot make a trade-mark of his own name, and thus debar another having the same name from using it in his business, if he does so honestly, and without any intention to appropriate wrongfully the good will of a business already established by others of the name. Every one has the absolute right to use his own name honestly in his own business for the purpose of advertising it, even though he may thereby incidentally interfere with and injure the business of another having the name. In such case the inconvenience or loss to which those having a common right to it are subjected is damnum absque injuria. But although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name."

The principle there announced is sustained by high authority. Croft v. Day, 7 Beav. 84; Holloway v. Holloway, 13 Beav. 209; Wotherspoon v. Currie, L. R. 5 H. L. 508; Thompson v. Montgomery, 41 Ch. Div. 35; Howard v. Henriques, 3 Sandf. 725; Meneely v. Meneely, 62 N. Y. 427; Lawrence Manuf'g Co. v. Tennessee Manuf'g

Co., 138 U. S. 537, 11 Sup. Ct. 396; Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625; Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966.

We have had occasion to consider the subject in Meyer v. Medicine Co., 18 U. S. App. ——, 7 C. C. A. 558, 58 Fed. 884, and there asserted the doctrine as follows:

"While the right of no one can be denied to employ his name in connection with his business, or in connection with articles of his own production, so as to show the business or product to be his, yet he should not be allowed to designate his article by his own name in such a way as to cause it to be mistaken for the manufacture or goods of another already on the market under the same or a similar name. Whether it be his na ic, or some other possession, every one, by the familiar maxim, must so use his own as not to injure the possession or right of another."

The point is settled. Disguise is the principle. "No one has a right to dress himself in colors or adopt or bear symbols to which he has no peculiar or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose either that he is that person, or that he is connected with and selling the manufacture of such person, while in reality he is selling his own." Croft v. Day, supra. Disguise defeats the very end and object of legitimate competition, which is the free choice of the public. One may not legally use means, whether marks or other indicia, or even his own name, with the purpose and to the end of selling his goods as the goods of another. If such means tend to attract to himself the trade that would have flowed to the person previously accustomed to use them, their use will be restrained by the law.

The question is therefore resolved into one of fact upon the evidence spread upon the record whether the means here employed expose the unwary to mistake one man's goods for the goods of another; whether they tend to divert from the appellee and attract to the appellants the legitimate trade that belongs to the former; and whether the use of the name of L. F. Pillsbury, as it is here employed, is not a fraud upon the rights of the appellee. It is without doubt true that flour brands are numerous, and the general shape and style are necessarily similar, because the packages which contain the flour are necessarily of like shape and character. But the question is not whether there is a general similarity of the brands in form necessitated by the general similarity in the shape of the packages which contain flour, but whether here is such marked simulation, and such conduct upon the part of the appellants in the marketing and sale of their goods, that lead to the conviction that they deliberately and fraudulently sought to impose upon the public, and to palm off their own goods as the manufactured product of the appellee. We are constrained to the conclusion that they have so done.

Considering first the two brands in question, there appears, we think, a studied attempt to simulate the brand of the appellee, and a studied design to incorporate in the brand of the appellants such differences only as shall, upon close investigation, serve to distinguish it from the brand of the appellee, which differences would not be

observed by the ordinary purchaser. The differences strike us as merely colorable; distinguishable upon comparison of the two brands, but not so to the eye of the purchaser without opportunity of comparison. The color of the sacks and of the letters in the two brands are the same, and the corresponding letters are printed in ink of the same color. The word "Best," in ink, is prominently displayed, and in substantially the same arrangement in the brand. In the one, the letters in the word "Best" are solid, in the other, with a diamond center. In the one, the letters "XXXX" are above and, in the other, below the word "Best." In the one, "Minnesota" is substituted for "Minneapolis, Minn." in the other. The circle in the one, surrounding the brand, is composed of three lines of blue dots, and the other is of but two lines. The name "Pillsbury" is similarly arranged, at the top, within the circle, and on each side of the brand; and "Pillsbury's Best" appears in ink below the circle, the only difference being that in the simulated brand the initials "L. F." are prefixed. But these differences are not such as would attract the attention of the ordinary purchaser, the two devices being otherwise alike in detail and general effect. The question, however, is of resemblances, not differences. A test which applies only after the deviations have been pointed out favors the counterfeit. We think it clear beyond reasonable doubt that the simulation is such as to deceive the ordinary purchaser desiring to buy the flour of the appellee into purchasing the flour thus put upon the market by the appellants. We must remember, in considering this and like cases, that the purchaser of goods, with respect to brands by which the goods are designated, is not bound to exercise a high degree of care. A specific article of approved excellence comes to be known by certain catch-words easily retained in memory, or by a certain picture which the eye readily recognizes. The purchaser is required only to use that care which persons ordinarily exercise under like circumstances. He is not bound to study or reflect; he acts upon the moment. He is without the opportunity of comparison. It is only when the difference is so gross that no sensible man, acting on the instant, would be deceived, that it can be said that the purchaser ought not to be protected from imposition. Indeed, some cases have gone to the length of declaring that the purchaser has a right to be careless, and that his want of caution in inspecting brands of goods with which he supposes himself to be familiar ought not to be allowed to uphold a simulation of a brand that is designed to work a fraud upon the public. However that may be, the imitation need only to be slight if it attaches to what is most salient, for the usual inattention of a purchaser renders a good will precarious if exposed to imposition.

An inspection of these brands shows that they are similar in appearance and in colors, and from the testimony in the case we are satisfied that the brand adopted by the appellants is not only calculated to, but does in fact, deceive the public into the purchase of the goods put upon the market by the appellants as the goods manufactured by the appellee. We are constrained to the conclusion that

the brand of the appellants was gotten up for that specific purpose. The appellant L. F. Pillsbury, prior to the time in question, had never been engaged in the flour business. He evidently was acquainted with the brand used by the appellee. He must have known that the product of the appellee had acquired under that brand a high reputation in the market, and was of ready sale. He was not, and had never been, engaged in milling, and, so far as we are informed by the record, knew nothing about it. He purchased flour from millers, putting it in sacks, branding the packages with this simulated device. He could not reasonably hope to compete in business with the appellee. He was of little or no means, residing and trading in a small suburban town. He could not hope to purchase of millers and undersell a miller. He could not reasonably expect in that way to obtain from the manufacturer a flour of the same quality as that manufactured by the appellee, and sell it for a less price than was asked by the appellee. The great competition in the manufacture of flour is well known, and the margin of profit must be small. It is only because of immense sales that the business can be made lucrative. And yet we are asked to believe that L. F. Pillsbury, without means, without knowledge of the business, without business connection, could purchase flour of manufacturers, in small quantities, of like quality, if not superior, to the flour of the appellee, yielding the usual profits of manufacture, repack it in barrels and sacks, put it upon the market, and, with a profit to himself, undersell the appellee in the sale of an article which had for years been produced at the Minneapolis mills, and had acquired a high reputation and a ready market over two continents. We do not credit the assertion of the appellants that the flour they thus put upon the market was of equal quality to that manufactured by the appellee. If it were so, it could make no difference in the consideration of the question whether, by the use of this simulated brand, the purchaser would likely be deceived in respect to the particular flour he desired to purchase. It is no answer to the charge of using a false and simulated brand that the article covered by the brand is of a superior quality to that which the purchaser desired to buy. You may not deceive a purchaser for his own benefit. The public will not be permitted to be deceived even for their own good. A purchaser has a right to buy the particular article he desires, and to be protected in the purchase.

We are forced to believe that the appellants have put upon the market an inferior article of flour, and in order to dispose of it profitably to themselves have placed upon it this false and simulated brand, that it may be sold upon the market as and for the flour manufactured by the appellee, and thus to obtain advantage to themselves from the high repute which the product of the appellee has acquired. The record is replete with evidence in support of this conclusion, not needed to be here recalled. We find confirmation of the fact in the manner in which the charge in this respect is met. It is asserted in the bill that the appellants use this simulated brand as a means of palming off their flour upon the public as the product of the appellee. The answer asserts that "they have always stated and made known

to their customers that said flour so handled by them under said brand is not the flour of the complainants, but is a flour put up under said brand by themselves, manufactured from Minnesota wheat, and that said flour, in their judgment, is equal to, if not superior, to that sold by Pillsbury-Washburn Flour Mills Company, Limited." It may be remarked, in passing, that if these brands are so dissimilar that the "most casual observer" cannot be imposed upon, why assure purchasers, wholesale and retail dealers, who are expected to be, and are naturally, more careful than a purchaser of a single package, that the goods sold were not the product of the Pillsbury Mills? If the dissimilarity was manifest, there would seem to exist no necessity for such assurance; and yet we are inclined to give credence to the assertion of the appellants in this respect, and therein we think we discover the keynote of this scheme. They sell their goods with the false and simulated brand upon them to wholesale and retail dealers at a price below that for which the genuine product of the Pillsbury Mills can be purchased by them. They disclose to the retail dealer their mode of procedure and their object. They appeal to the greed of their customers to purchase an inferior quality of flour thus falsely branded with the name of a superior article, that the dealers may palm it off as the genuine article. No ingenuity could devise a more effectual way to pirate a good will. In the large, bold, displayed words "Pillsbury's Best" and "Pillsbury's Best XXXX" they address the general public. In their dealings with middlemen they declare the truth, making them accomplices in the fraud for their share of the profit. True representations in aid of false ones but aggravate the fraud. A conclusive case to this point arose in a French court. Bardou v. Sabatou, Annales de la Prop., tome 14, p. 140, affirmed on appeal to the court of Paris, Annales de la Prop., tome 15, p. 115. A certain paper had for a trade-mark the word "Job." Another manufacturer put on the market a paper inclosed in wrappers of the same color, but differing in ornaments. This he thus described: "*GUERRE A JOB PAPIER TRES SUPERIEUR. Paris 80 Rue de Rivoli, 80. TAKE NOTICE—LET NO PERSON BE SURPRISED. I AM NOT THE SAME MARK of the cover which bears the title JOB. But I guaranty that I enclose a paper superior to JOB by the addition of hygienic substances.*" He also issued an advertisement in which he recognized the distinction between his paper and that of the proprietors of the Job paper, challenging them to deny the superiority of his. In enjoining him, the court said, *inter alia:*

"Whereas, the lawful competition which should exist between merchants cannot be extended to include right to take the distinctive denomination of a rival even for advertisements and circulars, with the design of diverting his custom; whereas, it is manifest that Sabatou, in the use of the name 'Job,' and in indicating the superiority of his paper, had no other object than to destroy the reputation enjoyed for the paper sold under the title of 'Job,' and to cause confusion by holding forth the said name; therefore," etc. Browne, Trade-Marks, § 398.

To similar effect is Seixo v. Provezende, 1 Ch. App. 192. We have said enough to show the manifest character of this scheme. It

falls, we think, clearly within the principle by which courts of equity are guided. The appellant Pillsbury has an undoubted right to use his own name in any honest way, but he has not the right to make the use of it here disclosed, to deceive the public, and to defraud the appellee.

In the consideration of this question we have not overlooked the case of Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151. That was the case of a trade-mark pure and simple, in which it was held that one cannot acquire the right to the exclusive use of the word "Columbia" as a trade-mark. The court, at page 467 (150 U. S., and page 151, 14 Sup. Ct.) of the opinion, observes:

"It is also shown by the testimony in this case that the flour manufactured from spring wheat, such as that dealt in both by the complainant and the defendant, is never bought or sold simply on the brand, but usually, if not always, by actual sample; and the proof fails to establish that the brand of the appellees was calculated to mislead, or did actually deceive or mislead. any one into supposing that the flour of the complainant was being bought, so that it cannot be said that the defendants were personating the complainant's business by using such a description or brand as to lead customers to suppose that they were trading with the appellant."

This case does not hold to the contrary of the principle which we have asserted, but, impliedly at least, approves the principle that if the brand had actually deceived or misled, or that one was personating another's business by using a description or brand that was deceptive, the case would fall within the principle we have stated. There it appeared that the flour was not sold or bought on the brand, but usually by actual sample; here the proof is different. There the proof failed to establish that the brand was calculated to mislead or deceive; here the proof is overwhelming to the effect that the brand used was designed to mislead, and actually did deceive and mislead.

It is further urged that the appellee should not receive equitable relief, for the reason that during the first years after its incorporation and acquirement of the business it failed to indicate the fact of transfer in connection with its use of the trade-name, and that thereby it worked deception upon the public in attempting to pass upon them goods purporting to be made by the original proprietors of the mills. It is claimed that this fact should avail to the denial of relief, within the authority of Siegert v. Abbott, 61 Md. 276; Partridge v. Menck, 1 How. App. 558; Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436. It may well be doubted if this case, upon its facts, falls within the reason of the authorities cited. Here the transaction was really but the incorporation of the parties who had built up and operated the business and mills in association with others; the supervision, superintendence, direction, management, and control of the business remaining and continuing in Mr. Charles A. Pillsbury as managing director, who had from the first controlled it, and under whose management the product of the mills acquired its high reputation. Under such circumstances it may well be said that the trade-name continued to assert the truth in its spirit, and essence, and gave truthful assurance to the public that the flour was the genuine product of the Minneapolis mills operated and controlled

by Mr. Pillsbury, notwithstanding the legal and technical change in ownership wrought by the incorporation. Can such conduct be fittingly characterized as misrepresentation and falsehood, preventing relief in equity? But, however that may be, it sufficiently appears that prior to this suit the appellee adopted the custom of stamping upon its packages of flour, in connection with and immediately preceding the monogram of the former firm of Charles A. Pillsbury & Co., the words, "Pillsbury-Washburn Flour Mills, Ltd., Successors to," thereby announcing the technical legal ownership of the mills and business and the origin of the product. We are therefore of opinion that in restraining the unlawful acts of the appellants we should do no violence to the principle that "he who comes into a court of equity seeking equity must come with pure hands." We see no occasion for the imputation of fraud to the appellee. Affirmed.