## WALTER BAKER & CO., Limited, v. BAKER.

(Circuit Court, W. D. Virginia. September 3, 1896.)

1. TRADE-MARK—USE OF ONE'S OWN NAME.

A man has a right to use his own name in connection with any business he honestly desires to carry on, but he will not be allowed to use it in such a way as to injure another having the same name; and, to prevent such injury, equity will direct him how he shall use his name to denote his own individuality.

2. SAME—INFRINGEMENT—PROOF OF INTENT.

The court cannot give great weight to mere denials by defendant of any intent to infringe, but will deduce his intent from his acts.

3. SAME—UNFAIR COMPETITION.

One who enters into competition with another person of the same name, who has an old and established business, is under an obligation to more widely differentiate his goods from those of the latter than is required of third persons having different names.

4. SAME.

Complainant's predecessors, of the name of Baker, commenced about 1780, at Dorchester, Mass., to make and sell preparations of chocolate, and the business has been carried on at the same place ever since. The goods have been long put up in various forms, having distinctive packages and marks, and bearing the words "Baker," "W. Baker," or "W. Baker & Co.," in connection with "Dorchester, Mass.," and also the words "Established 1780." In 1894 one W. H. Baker, a citizen of Winchester, Va., began making chocolate goods, and putting them up in packages, and with marks and labels, closely resembling those of complainant, and also bearing the words "W. H. Baker & Co.," "Winchester, Va.," and "Established in Mercantile Business in 1785." The only foundation for the latter statement was that his ancestors, or some of his kindred, had been engaged in the wholesale merchandise business since about that time. *Held*, that defendant was guilty of unfair competition, calculated to deceive the public to complainant's injury, and should be enjoined.

5. SAME—TRADE-NAMES—VALIDITY AND INFRINGEMENT.

The words "German Sweet Chocolate" ("German" being the name of an individual, which is adopted as an arbitrary designation, without geographical signification) is a valid trade-name, and is infringed by the words "Germania Sweet Chocolate."

This was a bill in equity to restrain alleged unfair competition in trade.

This is a suit brought for the purpose of restraining unfair competition in trade. The original bill was filed by Henry L. Pierce, and a supplemental bill has been filed by said Pierce and Walter Baker & Co., Limited, citizens of the state of Massachusetts, against W. H. Baker, a citizen of the state of Virginia, residing in the Western district of Virginia. The evidence establishes the following material facts: The complainant, Walter Baker & Co., Limited, is engaged in the business of manufacturing chocolate and other preparations of cocoa. This business was established by one James Baker about the year 1780 at Dorchester, Mass. It was afterwards carried on by his son Edmund Baker, his grandson Walter Baker, and after the death of said Walter Baker, in 1854, it was continued by one Sidney Williams and Henry L. Pierce, and is still carried on under the name of Walter Baker & Co., Limited. The business has been extensive and successful, and its preparations of cocoa have a high reputation in the markets of the United States. They have been awarded many premiums at exhibitions from the year 1850 to the present time, and a large amount of money has been expended annually in adver-

tising the goods. There are four classes of the goods manufactured by complainant which it is claimed have been subjected to unfair competition: First. "Baker's Premium No. 1 Chocolate" is put up and sold in cakes on which are stamped, "W. Baker, No. 1, Dorchester, Mass.," in large capitals, with certain marks and lines. The cakes weigh one-half pound each, and are so shaped that two cakes are wrapped each in a separate wrapper and then together in one wrapper, and sold in one-pound packages. These packages are wrapped in blue paper, with a yellow label thereon. Upon the top and bottom of this yellow label is a scroll of intertwined leaves, and at each end a coat of arms surmounted by a flag also surmounted by a scroll of intertwined leaves, bearing in the upper center the words "Baker's Chocolate," in large type, and the words "W. Baker & Co., Dorchester, Mass.," in small capitals, with a list of some other articles manufactured by the complainant. The blue wrapper and yellow label have been used by the complainant and its predecessors for more than 40 years. Second. A preparation of powdered cocoa put up by complainant in half-pound tin cans, of an oblong shape, on the lid end of which are stamped the words "Walter Baker & Co.'s Breakfast Cocoa," and around these cans is wrapped a label, on one face of which is prominently displayed the words "Established 1780," and "Walter Baker & Co.'s Breakfast Cocoa, Dorchester, Mass.," with a medallion, and directions for using. On the opposite face is a picture of a girl holding a tray and cup, with the words "La Belle Chocolatiere," which picture has been used by complainant for many years as a trade-mark. Third. The complainant has for many years manufactured a sweet chocolate called "German Sweet Chocolate," the word "German" being displayed on a label which is duly registered as a trade-mark under the laws of the United States. At each end of the label are the words "Sweet Chocolate," and on the back of the cake a small picture of "La Belle Chocolatiere," and the words "Trade-Mark, W. Baker & Co., Registered." Fourth. Complainant manufactures and puts up a brand of chocolate called "Vanilla Chocolate." It has a white wrapper with the words "Baker's Vanilla Chocolate" printed on it. It also has on it the complainant's trade-mark, "La Belle Chocolatiere," and in small letters the words "W. Baker & Co., Registered Trade-Mark." In June, 1894, the respondent, W. H. Baker, a citizen of Winchester, Va., entered into an arrangement with one J. Elwood Sanders, by which said Sanders became and is the chief salesman and manager of the respondent's chocolate business. At first the chocolate goods were manufactured by P. Griffing Company, of New York. These goods were delivered to the respondent in New York City, and were by him labeled and put upon the market. In September, 1894, about the time this suit was brought, the respondent purchased the plant of said P. Griffing Company, in New York, and since that time the goods have been manufactured at the same factory, with Joseph Griffing superintending the same for the respondent. The chocolate goods put up and sold by the respondent which are involved in this suit are as follows: First. A plain chocolate put up in packages, each containing two cakes, each cake weighing one-half pound. These cakes are wrapped in a blue wrapper, on which is a yellow label. At the top and bottom of the label is a scroll of leaves. At each end is a coat of arms partially surrounded by a scroll of leaves. At the top are the words "Established in Mercantile Business 1785." Below these words, in large type, are the words "W. H. Baker & Co.'s Chocolate," "Premium No. 1." Then, in smaller type, is given a description of the goods, and directions for using. At the bottom of the label are the words, in small capitals, "W. H. Baker & Co., Winchester, Va." Following these words, in smaller type, are the words "Producers of Premium Chocolate, Breakfast Cocoa, Sweet and Vanilla Chocolate." The wrapper is of the same shade of blue as the wrapper of the complainant on its plain chocolate, described as "Baker's Premium No. 1 Chocolate." The yellow label is the same in length and width as the yellow label of the complainant, but the yellow color is a shade lighter than that of the complainant's label. The cakes of chocolate are the same in size and mold as those of the complainant. They have stamped on them the words "W. H. Baker & Co., Winchester, Va.," and the same lines and marks as on the complainant's cakes. Second. The powdered cocoa put up by the respondent under the name of "W. H. Baker & Co.'s Breakfast Cocoa." This is put up in half-pound cans of the same shape and size as those used by the complainant for putting up its "Breakfast Cocoa." On the lid or opening end of the can are stamped the words "W. H. Baker & Co.'s Breakfast Cocoa." On one face of the can are the words "Established in Mercan-

tile Business 1785," in smaller type, and the words "Winchester, Va.," in small capitals. On the opposite face of the can is a picture of the bust of a girl in the act of drinking from a cup, and in large letters the words "Baker's Cocoa." Third. The respondent's manufacture of "Germania Sweet Chocolate." This has a label with the words, in capitals, "Germania Sweet Chocolate." At each end of the label are the words "Sweet Chocolate," in small capitals. On the upper edge are the words "Established in Mercantile Business 1785," and on the lower edge, in very small capitals, the words "W. H. Baker & Co., Producers of Chocolate and Cocoa Preparations, Winchester, Va., Philadelphia, Pa., New York." Fourth. The brand of respondent's "Baker's Vanilla Sweet Chocolate." This consists of a white wrapper with the words "Baker's Vanilla Sweet Chocolate," in capitals. At the upper edge are the words "Established in Mercantile Business 1785." The complainant claims that it has, as against the respondent and all others, the exclusive right to use, in connection with the manufacture and sale of chocolate and other preparations of cocoa, the designation "Baker," "W. Baker," and "W. Baker & Co."; that said names are so closely associated in the public mind with the product of its factory that no other person can use the word "Baker" in connection with the sale of chocolate and other preparations of cocoa, or on the labels and wrappers of such goods, without leading the public and dealers to believe that the goods are those of the complainant.

W. L. Putnam, George G. Grattan, and Rowland Cox, for complainant.

John Vincent and Robert T. Barton, for respondent.

PAUL, District Judge (after stating the facts). The first question presented by the foregoing statement of facts for the determination of the court is as to the power of a court of equity to enjoin a man from using his own name in connection with any business in which he wishes to engage. Very elaborate arguments have been made by counsel on this question, and numerous decisions of the state and federal courts cited. The result of these decisions is that a man has a right to use his own name in connection with any business he honestly desires to carry on. The doctrine is equally well settled that equity will direct how a man shall use his name in his purpose to denote his own individuality. He will not be allowed to so use his own name as to work an injury to another having the same name, nor to perpetrate a fraud upon the public. In Meyers v. Medicine Co., 7 C. C. A. 558, 58 Fed. 884, the court says:

"While the right of no one can be denied to use his name in connection with his business, or in connection with articles of his own production, so as to show the business or product to be his, yet he should not be allowed to designate his article by his own name in such a way as to cause it to be mistaken for the manufacture or goods of another already in the market under the same or a similar name. Whether it be his name, or some other possession, every one, by the familiar maxim, must so use his own as not to injure the possession or right of another. The question is therefore resolved into one of fact, upon the evidence spread upon the record,—whether the means here employed expose the unwary to mistake one man's goods for the goods of another?"

In Landreth v. Landreth, 22 Fed. 41, the doctrine is thus stated:

"Of course, a party cannot be debarred from the right to use his own name in advertising his goods and putting them on the market, but where other persons bearing the same surname have previously used the name in connection with their goods in such manner and for such a length of time as to make it a guaranty that the goods bearing the name emanated from them, they will be protected against the use of that name, even by a person bearing the same name, in such form as to constitute a false representation of the origin of the goods."

In that case Judge Dyer said:

"Now, as I have said, the defendant's label is, as it seems to me, a palpable imitation of the complainant's. In the color of the ink used, in the arrangement of the words, and in the general style of the labels, he has, so to speak, dressed his goods in the garb previously adopted by the complainants. Whether intended or not, this necessarily operates a fraud upon them, and upon the public."

In a recent case (Pillsbury v. Flour Mills) decided by the circuit court of appeals, Seventh circuit (12 C. C. A. 432, 64 Fed. 841), the court said:

"The general principles by which courts are guided in such cases are well and correctly stated in Cement Co. v. Le Page, 147 Mass. 206, 17 N. E. 304, as follows: 'A person cannot make a trade-mark of his own name, and thus debar another having the same name from using it in his business, if he does so honestly, and without any intention to appropriate wrongfully the good will of a business already established by others of the name. Every one has the absolute right to use his own name honestly in his own business for the purpose of advertising it, even though he may thereby incidentally interfere with and injure the business of another having the name. In such case the inconvenience or loss to which those having a common right to it are subjected is damnum absque injuria. But, although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the articles produced by them, and thus produce injury to the other beyond that which results from the similarity of names.'"

The respondent, in his answer and in his testimony, avers that he had no intention of infringing on the rights of the complainant. He has taken the testimony of a number of witnesses to prove his high character as a citizen and business man. In the argument great stress is laid upon this testimony by respondent's counsel, as negativing the idea of a fraudulent purpose on the part of the respondent in dressing up his goods in imitation of the complainant's. The court cannot give to this evidence the weight to which counsel insist it is entitled. It must in this case, as in every case where intent is the subject of investigation, deduce the intent from the acts of the respondent. These constitute the proof as to the purpose of the respondent, and by them the court must be guided. The evidence shows that the respondent, prior to 1894, had never engaged in the business of a dealer in chocolate, and had no experience in the manufacture of the same; that, in the months of May and June of that year, he had several conferences with one J. Elwood Sanders, then in the employ of Rockwood & Co., manufacturers and sellers of chocolate. The respondent engaged the services of Sanders, and commenced the sale of chocolate. The respondent states that a partnership was at that time contemplated between himself and Sanders, and the firm name of W. H. Baker & Co. adopted. But that partnership was not formed, nor has the respondent had a partner at any time in the chocolate business. With regard to his conferences with Sanders, the respondent is asked: "Did you know that Walter Baker & Co. was an old, established house in the business for a great many years?" He says: "I did." "It did not strike you, then, when Walter Baker's goods were ordered by you, and of you, in your grocery business, that they were spoken of simply as 'Baker's goods'; that is, prior to the time you went into the chocolate business?" Answer: "I think so." "Did Sanders

suggest to you, in any of your conversations, that the name 'Baker' would be an advantage to you in the chocolate business, on account of the reputation of Walter Baker & Co.?" Answer: "He may have suggested something of that kind, but I did not pay any attention to it, because of the fact that I did not intend to sell my chocolate on the reputation of any one else, but by price and quality to attract the trade to me." It is clearly apparent from the testimony of the respondent, and from other evidence in the cause, that, in the arrangement between the respondent and Sanders, respondent's name of "Baker" was to play a prominent part in the sale of his chocolate goods. When this testimony is taken in connection with the similarity in the shape and size between the cakes of chocolate manufactured for the respondent by P. Griffing Company and the chocolate cakes of the complainant, and the stamps and lines thereon; the identity in color of the blue wrappers, and the similarity of the yellow labels on each; the identity in shape and size of the tin cans used by each for putting up cocoa, and the similarity of the stamps and inscriptions thereon; the simulation of the inscriptions on the complainant's "German Sweet Chocolate" and its "Vanilla Chocolate,"—it is impossible to escape the conclusion that it was the purpose of the respondent to put upon the market his goods in such condition and appearance that the same might be readily accepted as the goods of the complainant. That such was the result the evidence abundantly shows. The testimony of witnesses for complainant and for defendant, respectively, clearly establishes the fact that the complainant's goods had a high reputation of long standing with jobbers and retailers in the trade, and with consumers. A number of dealers testify that complainant's goods had become well known as "Baker's Chocolate," and that, when "Baker's Chocolate" was called for, it was understood to be Walter Baker's chocolate that was intended. The evidence shows that the complainant's goods were advertised widely at great expense,—from $60,000 to $160,000 being annually expended for advertising them in trade journals, in family and household papers, and by other means, such as would bring a knowledge of these goods, not only to the jobber and retailer, but also to the consumer. It is a pertinent fact to be noted in this connection that respondent's advertisements of his goods were inserted in journals that reached the trade, and not the consumer, and that his circulars were sent to the jobbers and the trade. The testimony of grocers and consumers, taken in Baltimore, Philadelphia, and other cities, abundantly shows that great confusion exists in the trade and with the public between the goods of the complainant and those of the respondent, and that both the trade and the public were deceived into purchasing the goods of respondent when they thought they were getting those of complainant. This deception arises from the points of resemblance between the wrappers, labels, inscriptions, designations, shapes of cakes, cans, etc., of the complainant and those of the respondent.

The respondent claims that, in using the blue wrapper and yellow label upon his plain chocolate, he has used what he terms the "livery of plain chocolate." He files as exhibits the products of several

other American manufacturers of chocolate, inclosed in blue wrappers with yellow labels. But it is readily noticeable that these all differ from complainant's wrapper and label in such plainly-distinctive characteristics as to guard against deception, and prevent confusion with the goods of complainant. Maillard, Miller, Barker, Rockwood & Co., and other American manufacturers of chocolate, use blue wrappers with yellow labels, but the labels differ widely from that of complainant in every respect except in the color. The name of each of these different manufacturers, made prominent on his label, is a distinctive feature to attract attention to the real maker, and to prevent confusion with the goods of other manufacturers. The name of respondent being the same as that of complainant, it is incumbent upon him to more widely differentiate his goods from those of complainant than is required of another manufacturer having a different name.

The respondent states in his answer that "he has from the beginning, and day by day, in the whole conduct of his business, by letter heads, price lists, cards, most extensive advertisements, and in every way known to commercial methods, warned dealers and the public against the possibility of confusing respondent's name with that of any other Baker & Co. engaged in the chocolate business." This he says he has done by conspicuously printing on his letter heads and in his advertisements, "Positively no connection with any other Baker & Co., chocolate makers," and by an advertisement as follows: "You will find other brands of chocolate and cocoa placed on the market under the name of Baker & Co., but take only that having the initials 'W. H. Baker & Co.,' and then you will always be satisfied." Conspicuously with these announcements also appear the words "Established in Mercantile Business 1785." A similar defense was made in the case of Pillsbury v. Flour Mills, 12 C. C. A. 432, 64 Fed. 841, and in that case the court said:

"The answer asserts that 'they have always stated and made known to their customers that said flour so handled by them under said brand is not the flour of the complainants, but is a flour put up under said brand by themselves, manufactured from Minnesota wheat, and that said flour, in their judgment, is equal to, if not superior to, that sold by Pillsbury-Washburn Flour-Mills Company, Limited.' It may be remarked in passing that, if these brands are so dissimilar that the 'most casual observer' cannot be imposed upon, why assure purchasers, wholesale and retail dealers, who are expected to be, and are naturally, more careful than a purchaser of a single package, that the goods sold were not the product of the Pillsbury Mills? If the dissimilarity was manifest, there would seem to exist no necessity for such assurance; and yet we are inclined to give credence to the assertion of the appellants in this respect, and therein we think we discover the keynote of this scheme. They sell their goods with the false and simulated brand upon them to wholesale and retail dealers at a price below that for which the genuine product of the Pillsbury Mills can be purchased by them. They disclose to the retail dealer their mode of procedure, and their object. They appeal to the greed of their customers to purchase an inferior quality of flour, thus falsely branded with the name of a superior article, that the dealers may palm it off as the genuine article. No ingenuity could devise a more effectual way to pirate a good will."

We may in this case, with the same propriety, ask, if the goods of the respondent are so distinctly marked as to prevent confusion with those of the complainant, why the necessity of these frequent

warnings to the public that they are not the goods of the complainant? A careful consideration of the evidence, and an inspection of the packages, cans, wrappers, labels, inscriptions, etc., of the goods of complainant and those of the respondent, can lead the court to no other conclusion than that there was a deliberate purpose to place the goods of the respondent upon the market in a guise resembling the complainant's goods as nearly as possible so as to avoid a direct imitation.

The words "Established 1780," printed on complainant's goods, are intended to, and do truthfully, convey to the public mind the idea that Walter Baker & Co. is an old, firmly established, successful, and reliable concern. This is the well-known purpose of an announcement of this kind. It secures in the public mind, for the party using it, a well-earned and deserved confidence in its integrity, based on its long and successful career in the business in which it is engaged. The respondent had not been engaged in the manufacture and sale of chocolate and other preparations of cocoa such a length of time as justified him in announcing to the dealers in and consumers of chocolate goods that the firm of W. H. Baker & Co. had been carrying on this business since the year 1785. He could not honestly and truthfully do so. He had only commenced the chocolate business in 1894, under the firm name of W. H. Baker & Co., when he was, as now, the only member of the firm. He claims that he has a right to put upon his goods the words "Established in Mercantile Business 1785," because his ancestors and other kindred of the name of Baker had been engaged in a wholesale merchandise business at Winchester, Va., since about the year 1785, and he was connected with a firm in that line of business at the time he went into the chocolate business. It is admitted that he is the only member of the chocolate firm of W. H. Baker & Co., and that neither the wholesale merchandise firm of Baker & Co., at Winchester, nor any member of it except himself, is connected with the chocolate business. In using the words "Established in Mercantile Business 1785," it is palpable that the words "in Mercantile Business" were inserted for the sole purpose of avoiding a direct imitation of the words "Established 1780" used by complainant on its goods. The use of the words "Established in Mercantile Business 1785" could have had no other purpose than to convey to the public mind the idea that the firm of W. H. Baker & Co., manufacturers of chocolate, is the same as Walter Baker & Co., or W. Baker & Co., which had long used the words "Established 1780," and with which dealers and consumers had become familiar, and, as the evidence shows, did in fact have that effect. This deceptive and misleading statement is not only made on the goods of the respondent, but is printed as part of all his circulars, bill heads, letter heads, and advertisements. As showing the misleading effect of this statement, the evidence discloses that the Pennsylvania Grocer, a paper published at Pittsburg, Pa., in its issue of November 16, 1895, made an editorial notice of respondent's goods, advertised in said paper, in which it said:

"These goods have borne the test for upwards of one hundred years, and have steadily grown in public favor, until to-day they are without successful rival."

In his evidence, respondent's witness House, who was the author of the editorial, says:

"I looked over the advertisement of W. H. Baker & Co., and at the top saw something about 1785, and, without reading carefully, I accepted as a matter of course that they had been in business that long, and concluded that they had been in the chocolate and cocoa business that long; and that is where I got my idea."

In the preparation of his goods, the respondent has closely imitated the goods of the complainant in the most prominent characteristics in which they are presented to the public. In the plain chocolate the most striking of these prominent characteristics are the shape and size of the packages, the blue wrapper, and the yellow label adopted by the complainant, with the prominent words "Baker's Chocolate." The respondent puts up his goods in packages of the same shape and size, with blue wrapper and yellow label, with the prominent words "W. H. Baker & Co.'s Chocolate." The prominent features of the package containing the powdered cocoa prepared by the complainant which are imitated by the respondent are the shape and size of the tin cans; the words "Walter Baker & Co.'s Breakfast Cocoa," stamped on the lid end of the can; on one side the same words in large capitals, with a shield in the middle, and the words "Established 1780"; on the reverse side, a picture of "La Belle Chocolatiere," and the words "W. Baker & Co. Registered Trade-Mark." The respondent adopts a tin can of the same shape and size as the complainant's, with the words "W. H. Baker & Co.'s Breakfast Cocoa" stamped on the lid end of the can. On one side of the can, in large capitals, are the words "W. H. Baker & Co.'s Breakfast Cocoa," "Established in Mercantile Business 1785." On the reverse side is a picture of the bust of a girl, and the words "Baker's Cocoa," in large capitals, and in small capitals the words "Trade-Mark."

The distinctive features of the complainant's label on its "German Sweet Chocolate" are the words "German Sweet Chocolate" across it in large type. The picture of the chocolate girl, with the name of Walter Baker & Co., are pasted on the reverse side of the package. Across each end of the label are the words "Sweet Chocolate." The respondent's label on his "Germania Sweet Chocolate" is of the same shape and size as complainant's label on its "German Sweet Chocolate," and has on it, in large letters, the words "Germania Sweet Chocolate," and across each end the words "Sweet Chocolate." The cakes of this brand of respondent's chocolate are of the same shape and size as the complainant's cakes of "German Sweet Chocolate." The evidence shows that the word "German," used by the complainant, was adopted as a trade-mark because of Samuel German, a person employed by the complainant in connection with the manufacture of this kind of chocolate, which has become widely and favorably known as "German Sweet Chocolate." The trade-mark was registered by Samuel German himself, and afterwards assigned to complainant, by whom it has been used a long time, and has become identified with its preparations of sweet chocolate. The respondent claims that the word "German," being a geographical name, cannot be appropriated as a trade-name. But the word "German," as used

by the complainant, is not used in a geographical sense, but it is the name of an individual, adopted as an arbitrary or fancy name. It is in no wise descriptive of the quality of the chocolate in connection with which it is used. Does the word "Germania," adopted by the respondent as a trade-name for his sweet chocolate, so nearly resemble the word "German" as to make it an infringement of the complainant's trade-name? The court is of opinion that it does. The word "Germania" does not describe any quality or ingredient of respondent's sweet chocolate, and no reason is given for its adoption; and it would be difficult to suggest any reason other than a desire on the part of the respondent to give to his sweet chocolate a designation as closely resembling that of a well-known product in the market, so as to avoid a direct adoption of the trade-name of the rival maker. "Germania" is as much like "German" as "Cottileo" is like "Cottolene" (N. K. Fairbank Co. v. Central Lard Co., 64 Fed. 133), or as "Mojava" is like "Momaja" (Grocery Co. v. Sloan, 68 Fed. 539), or as "Cellonite" is like "Celluloid" (Celluloid Manuf'g Co. v. Cellonite Manuf'g Co., 32 Fed. 94). In all of these cases the courts held that there were infringing resemblances. Confusion between two brands of chocolate, one styled "German Sweet Chocolate," and the other "Germania Sweet Chocolate," might have been readily anticipated. The respondent acknowledges that such confusion did arise. He admits in his answer, after referring to orders which he had received for his "German Sweet Chocolate," that the possibility of confusion was manifest, and that it was enough to induce him to suspend the further sale of this brand of chocolate, and that on September 8, 1894, he directed his salesmen to take no further orders for this brand of chocolate, and he states that since that date no order for this chocolate has been filled by him. But he says that he does not concede that the use of the word "Germania" is an infringement on the word "German," and that he will renew his sales of his sweet chocolate if he sees fit to do so.

The resemblance between respondent's "Vanilla Sweet Chocolate" and the complainant's chocolate called "Baker's Vanilla Chocolate" is less striking than is the case with regard to other kinds of chocolate goods of which complaint is made in this suit. Complainant's cakes are put up in white wrappers, on which (and not on a separate label pasted thereon) the inscription is printed in black-letter script. The inscription is: "Baker's Vanilla Chocolate. Walter Baker & Co., Ltd. Dorchester, Mass. Established 1780. Gold Medal, Paris, 1878;" and words descriptive of the goods, and a guaranty of their purity. On respondent's cakes is pasted on the wrapper a white label printed in fancy letters and colors, the distinctive features of which are the words "Baker's Vanilla Sweet Chocolate," a representation, and the name of a fleur de lis, the words "Established in Mercantile Business 1785," and on one end the words "W. H. Baker & Co., Winchester, Va., Philadelphia & New York." The court sees in these two labels no resemblance of which the complainant has the right to complain, except the use of the word "Baker" in connection with the words "Vanilla Sweet Chocolate" on respondent's label, and the words "Established in Mercantile Business 1785." The

words "Vanilla Sweet Chocolate" describe the ingredients of the preparation.

The respondent, entering the chocolate market under a firm name so nearly resembling that of the complainant, an old-established and well-known concern, did not make the effort incumbent on him to distinguish his goods from those of the complainant so as to prevent confusion. An inspection of the great number of cans, labels, inscriptions, designations, and characteristic marks of other dealers in chocolate, American and foreign, produced as evidence in this cause, shows that there is no difficulty in one dealer so preparing his goods as to distinguish them from those of another. With the widest field from which to select wrappers, labels, cans, inscriptions, words, phrases, and designations, the respondent has so nearly simulated in these respects the chocolate goods of the complainant as to lead dealers and consumers to believe that they were buying the complainant's goods when they were really getting those of the respondent. To prevent this confusion, and to protect the complainant and the public against this unfair competition and deception, an injunction will be entered restraining the respondent in the following particulars: From using in connection with his business as a maker and seller of chocolate and other preparations of cocoa the words "& Co."; the words "Established in Mercantile Business 1785"; from the use of the yellow label on his plain chocolate; and he will be required to substitute another and entirely different label therefor. In the manufacture and sale of his powdered cocoa, he will be restrained from using cans of the same shape as those of the complainant, and from using the words "Breakfast Cocoa" in connection with the word "Baker," and from using on the side of the can on which now appears a picture of the bust of a girl the words "Baker's Cocoa." From using the word "Germania" on the label of his sweet chocolate. On the label of his "Vanilla Sweet Chocolate" he will be required to use his name of "Baker" in such way as will make it plainly distinguishable from the name of the complainant. The court will not enjoin the respondent, as prayed in the bill, from using his name "Baker" in connection with the manufacture and sale of chocolate. Nor will it enjoin him from using the blue wrapper on his plain chocolate, as wrappers of this color have long been in very general use among manufacturers and sellers of chocolate goods. For the same reason the court will not enjoin the respondent from making his plain chocolate in the same-shaped cakes or molds as those of the complainant. Considerable evidence has been taken in this cause as to the quality, respectively, of the goods sold by the complainant and those sold by the respondent. But in the argument this branch of the case was very cursorily treated by counsel on both sides, and the court, with its views as to the material grounds on which its decision must rest, has not deemed it necessary to discuss this question.