### J. F. ROWLEY CO. v. ROWLEY.

(Circuit Court, W. D. Pennsylvania. July 20, 1907.)

#### No. 22.

TRADE-NAMES—WRONGFUL USE—UNLAWFUL COMPETITION—NAMES OF INDIVIDUALS.

Complainant's president, having built up a large business in the manufacture of artificial legs under his own name, which became widely and favorably known as "Rowley" legs, transferred his business and good will to complainant, which employed defendant, a brother of its president, of the same name, to open an agency in another city. This defendant conducted until a disagreement arose, when he began manufacturing legs in competition with complainant, advertising himself as manufacturing "Rowley Artificial Limbs," and in various other ways, by using the name "Rowley," misleading the public to believe that the limbs sold by defendant were those manufactured by complainant. *Held*, that defendant was not entitled to use his name in such manner, and that complainant was entitled to an injunction restraining defendant's use of the name "Rowley" in connection with artificial limbs manufactured by him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 75.

Right to use one's own name. See notes to R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 17 C. C. A. 579; Kathreiner's MalzKaffee Fab. v. Pastor Kneipp Med. Co., 27 C. C. A. 357.]

Frank Ewing and Gemmill & Foell, for complainant.
John H. Roney, for respondent.

BUFFINGTON, Circuit Judge. This is a bill in equity brought by the J. F. Rowley Company, a corporation of Illinois, and hereinafter called "complainant," against E. H. Rowley, a citizen of Pennsylvania, hereinafter styled "respondent." Complainant and its predecessors for many years manufactured artificial legs, have built up a large business, and acquired a valuable good will for their product. The evidence clearly shows that in conversation and correspondence artificial legs of their make are known as "Rowley" legs. The business was started by J. F. Rowley about 25 years ago, and his rights were later vested in the complainant company of which he is president.

The respondent is a brother of J. F. Rowley, and for some three years was employed by said company. In December, 1904, he was sent by complainant to open an agency at Pittsburgh. He remained in charge of such agency until April, 1905, when, owing to some difference between him and J. F. Rowley, his agency was terminated, and shortly thereafter respondent opened an establishment in Pittsburgh, and began the manufacture and sale of artificial limbs on his own account. The proofs show respondent after coming to Pittsburgh soon realized that that city, owing to its large manufacturing plants and the accidents therein, was a very favorable market for artificial limbs. The local business of complainant during the five months of respondent's service grew from $300 to $1,000 per month. The proofs show that respondent knew and clearly appreciated the value of the name Rowley, and the good will which under that name complainant had for its product. They also show that the victims of these accidents are often ignorant and inexperienced in business methods, and that designing, unscrupulous dealers could readily deceive them into purchasing limbs from them when they intended to get those of another make. This is shown, for instance, in the case of Mike Horan, a Slavish laborer. Horan came to Pittsburgh to get an artificial limb made by complainant. He had a directed envelope of that company, with a check for $100 in it to pay for a limb, and was on his way from the station to complainant's place of business when he was met by a salesman of respondent, who had then started in business, as hereinafter stated, in his own name, was shown respondent's card, the names compared, and taken to respondent's instead of complainant's place of business. There the respondent met him, took the check out of the envelope of complainant, put the check in one of his own, and a leg of respondent's make was sold to him, and no explanation given of the substitution thus made. This incident, in connection with the disingenuous, misleading conduct practiced by respondent and by others in his employ, abundantly satisfy us that this business, which in view of the misfortunes of those with whom it deals should be of the fairest and frankest character, is one sullied in many instances by misleading and deceiving ignorant persons.

The proofs show that respondent appreciated very fully the benefits that would accrue to him by use of the name Rowley in connection with the limbs he made. Thus the witness Spence, speaking of just prior to respondent's starting his business, testifies:

"I told him that the Rowley leg of course was patented, and that he could not make that, and he replied that he would make a leg that the people would not know the difference between it and the Rowley, and that his name was Rowley, and he would get the business anyhow. To use his own words, he said: 'All I have to do when I visit the trade is to tell them my name, and they are ready for business.'"

### The witness Lynn says:

"I don't think we [that is, he and respondent] ever held a conversation about the business but that he tried to impress it upon me and everybody else that the Rowley name was the whole thing he was doing business with; that it belonged to him, and he would use it whenever he wanted to."

In answer to the question, "What, if anything, did he say in these conversations as to whether the fact that his name was Rowley was beneficial to his business or not?" Lynn said: "The Rowley was the only name that he had to do business with; he couldn't do it under any other name and make a success of it." His plan to trench on the established Rowley business is evidenced by the fact that he used no catalogues, etc., of his own. Indeed, he made use of complainant's catalogue itself, and the proofs satisfy us that, while refraining from so stating to customers, he so used it with some customers as to convey to them the impression that he was still employed by the complainant, and the limbs he was selling them were made by that company. Indeed he made some slight changes or repairs in limbs of complainant's make, and referred to the wearers of them as using respondent's make. We think his purpose to avail himself of complainant's trade good will is clearly shown in the sign over his place of business, which contained the words "E. H. Rowley" above, and immediately below this, and in large letters, the words "Rowley Artificial Limbs." His desire to associate himself with the business of complainant and his interest in doing so are shown by his exhibition of pictures of himself working in their establishment, of him fitting limbs of their make, and of his untrue statement that he had been employed at Chicago 12 years. Thus, in answer to a decoy letter the complainant had a prospective customer write him to ascertain if he was representing himself as making the Rowley leg, he wrote from Pittsburgh:

"I am making the Rowley legs, and am making them here, so if you come here I can give you the same treatment I give others while I was in Chicago, and save you the expense of going so far. * * * I have a man here who walks 'slack' wire with both legs off below the knee [an untruth]. I was in Chicago 12 years [another; he was there less than four years], and am now located here,' so can give you the same treatment as all Rowley wearers get."

There are many other things in the proofs to which reference might be made which, in connection with the above, convince us that the respondent, knowing the name Rowley was the trade designation of complainant's product, used his own name in starting business, not as a legitimate and honest use thereof, but as a fraudulent aid to filch the complainant's business. If the respondent's name was not Rowley, no court would for a moment permit him to thus use that name, which had already gained a valuable trade significance in designating the goods of another maker. But if a fraudulent purpose to filch trade good will exists, the fact that it is attempted under the semblance of the use of a man's own name makes the use none the less wrong. As an abstract right, every person has the right to the use of his own name; but when the use of such name is but a cloak to cover an intended fraud upon the rights of another, the wrongdoer has himself and not the law to blame for placing a limitation upon the right to the use thereof. Authorities in support of this view are found in Valentine v. Valentine, 83 L. T. N. S. 259; Cash v. Cash, 84 L. T. N. S. 349; Jamieson v. Jamieson, 15 Rep. Pat. Cases, 193; Hires v. Hires, 6 Pa. Dist. 285; cases cited in 28 Amer. & Eng. Ency. Law, 426; Croft v. Day, 7 Beav. 84; Pillsbury v. Flour Mills Co., 64 Fed. 841,

12 C. C. A. 432; and Chemical Company v. Meyers, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247, where it is said:

"It is hardly necessary to say that an ordinary surname cannot be appropriated as a trade-mark by any one person as against others of the same name, who are using it for a legitimate purpose, although cases are not wanting of injunctions issued to restrain the use even of one's own name where a fraud upon another is manifestly intended."

In view of the facts of this case, and particularly of the conduct of this respondent, we are very clear that nothing short of a total prohibition of the name Rowley in connection with the manufacture and sale of artificial limbs will grant to the complainant that complete protection and preservation of its property in its trade-name and good will to which it is entitled under the law. A form of decree enjoining respondent from using the name Rowley in connection with the sale of artificial limbs may therefore be submitted.