R. J. REYNOLDS TOBACCO CO. v. ALLEN BROS. TOBACCO CO.

(Circuit Court, W. D. Virginia. March 20, 1907.)

1. TRADE-MARKS AND TRADE-NAMES—SUIT FOR UNFAIR COMPETITION—DEFENSES.

The claim that a conveyance by one manufacturing corporation to another of all its property, including its trade-marks, trade-names, brands, and labels, contains a provision in violation of the anti-trust law of the United States, is not available as a defense by another manufacturer when sued for infringement or unfair competition in respect to a trade-mark, brand, or label, where it is shown that the same has been contin-

uously used by the grantee as its own, since a time prior to the commencement of the alleged infringement or unfair imitation.

[Ed. Note.—Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare et al. v. Harper & Bros., 30 C. C. A. 376.]

2. SAME—UNFAIR COMPETITION—SIMULATION OF DRESS.

Complainant and its predecessors in business from about 1880 made and sold a brand of plug tobacco known as "Schnapps," and in 1894 commenced placing upon the plugs tin tags of rhomboid shape, and having a dark background with the word "Schnapps" thereon in red letters slanting backward, which tag, as shown by the evidence, was novel and distinctive. During the following 12 years nearly 800,000,000 of such tags were used, and also several millions of advertisements, hangers, etc., were sent out having thereon pictures of such tag which came to be known throughout the Southern states as the distinctive mark of the Schnapps brand. Many of the retail customers were unable to read, but identified complainant's tobacco entirely by the tag, and the size and shape of the plug. Later defendant put upon the market a cheaper grade of tobacco in plugs of the same size and shape, and with tags thereon of the same size, shape, style, and colors; the only difference being in the name which was "Traveller" instead of "Schnapps," which difference could not be distinguished at a short distance. The evidence showed that the simulation was intended to, and did in fact, deceive customers who intended to buy complainant's product. *Held*, that such simulation constituted unfair competition and entitled complainant to an injunction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 81.]

In Equity.

Frank F. Reed, for complainant.
Caskie & Coleman, for defendant.

PRITCHARD, Circuit Judge. This suit was instituted in March, 1906, and seeks to enjoin the defendant from unfair and fraudulent competition. Both the complainant and defendant are engaged in the business of manufacturing smoking and chewing tobacco, the complainant at Winston-Salem, N. C., and the defendant at Lynchburg. Va. Complainant is a corporation created under the laws of New Jersey, and the defendant is a Virginia corporation. The sum or value in controversy exceeds $2,000, exclusive of cost and interest. In 1880 Richard J. Reynolds, then a manufacturer of plug tobacco, originated a formula or recipe, selected the name "Schnapps" as the trade-mark or trade-name for the product, and placed his article upon the market under that style. R. J. Reynolds was succeeded in business in 1888 by R. J. Reynolds & Co., a copartnership, composed of R. J. Reynolds, William N. Reynolds, and Henry Roan. In 1890 the copartnership was converted into the R. J. Reynolds Tobacco Company of North Carolina, and this company, in 1899, sold out to, and was succeeded by, the R. J. Reynolds Tobacco Company of New Jersey, the complainant. The copartnership and corporations in each instance acquired the plant, assets, property, good will, trade-names, trade-marks, trade-dress, recipes, and trade-rights of the predecessor, announced succession, preserved the Schnapps formula as a trade-secret, and continued the manufacture of the brand at the same place, and in substantially the same way under the general conduct and supervision of the originator of both the business and

brand. Prior to 1894, Schnapps had been marketed with the tag in various designs. In that year a new and theretofore unused style of tag was gotten up, and from that date employed for the tag, consisting of a narrow tin rhomboid, exhibiting a dark brown or black background with the word "Schnapps" imprinted thereon in red back-slanting letters. Two or three such tags, one for each cut, are placed upon each plug, and are the only badges or marks of origin or identification attached to the tobacco and accompanying it, usually seen by the consumer. The plugs with the tags attached are packed in the usual way in boxes or caddies which bear the name and address of the maker, and an enlarged reproduction of the tag upon the sides and ends. In retail stores, where the tobacco is sold to users, the caddies are usually unheaded and placed in show cases or rear shelves where but little of the letter press thereon is visible, but where the general appearance of the tag can be seen; and from such caddies the retailer passes out the plugs or cuts to the buyer. The market for this brand embraces the Southern states. The brand has been, especially since 1894, extensively advertised by signs, hangers, posters, and circulars, which usually have reproduced on an enlarged scale the peculiar identifying tag. About $1,000,000 have been expended in advertising the brand of tobacco called "Schnapps." The sales have reached 11,500,000 pounds annually. The consumers are largely colored and white people unable to read. The tag is thoroughly associated with and in the minds of users, and identifies the product of complainant, directly or indirectly, by signifying the thing desired. Beginning in 1902, after defendant's infringement started, indented letters were used for the Schnapps tag, and to some extent advertised as identifying the genuine product. Six years after Schnapps was well established and known, and the peculiar features of the tag associated and identified with, and relied upon as a badge of origin, defendant, a rival plug tobacco manufacturer, with knowledge of the facts relative to Schnapps came upon the market with a new brand styled "Traveller," and employed a tag of same dimension, shape, and color, and the word "Traveller" inscribed thereon in red back-slanting letters. The plugs of tobacco are identical in shape, size, color, and weight with complainant's; have the tag affixed in the same places and numbers, and are packed in boxes and caddies of the same sizes. The shapes, sizes, and colors of plugs, number of cuts, and places of tags, method of packing, and sizes and shapes of boxes, are common to the trade. Traveller tobacco is inferior in quality, is sold to the trade for a less price than the brand of complainant known and designated as "Schnapps," and sold to the consumer for the same prices, and is not advertised to any extent. It is exposed for sale and sold in the same way and to the same class of consumers, and in the same markets as Schnapps.

It is insisted by the complainant that the defendants' salesmen are requested to suggest to retail dealers that the "Traveller" brand can be substituted for "Schnapps" with greater profit; and this has been done, and is being done. It is also insisted that it is shown by the testimony that the defendants at the suggestion of a customer by the name of Tom Morton, of Tennessee, adopted the size, color of tag, etc., and color of letterpress to enable such substitution and passing off of the

Traveller brand of tobacco; that the defendants' salesmen had deliberately and methodically represented to retail dealers that by similarity of the label "Traveller" brand could be palmed off on buyers as "Schnapps"; that the imitation is calculated and does deceive buyers; that the defendants have been repeatedly and cautiously warned, but have refused, to desist their conduct; that although the imitation tag has been on the market for four or five years, it is only within the last 18 months that it has been actively urged or pushed and that it was not until after the institution of this suit that the fraudulent inception of Traveller was ascertained by complainant. The injunction sought is to stay the use in the manufacture, packing, and distributing of plug tobacco, containing a tag identical or like that of complainant, or the tag used by defendants of the same style or color, style, color, or arrangement of letterpress, calculated to enable or of enabling the plug tobacco of the defendants to be substituted and passed off, and sold as the plug tobacco of complainant. It is not claimed that the Traveller brand is an infringement of the Schnapps brand as a trademark or trade-name. This is a suit to enjoin unfair and fraudulent competition in trade. It is insisted by counsel for defendants that there is a want of title to the Schnapps brand and tag, because of a stipulation in the conveyance from the R. J. Reynolds Tobacco Company of North Carolina to the complainant, the R. J. Reynolds Tobacco Company of New Jersey, upon the ground that the contract in question contains a clause in restraint of interstate commerce or trade, and therefore void.

The amended bill of complaint shows the inception of the business in 1880 by Richard J. Reynolds, its transfer in 1888 to R. J. Reynolds & Co.; the succession in 1890, of the R. J. Reynolds Tobacco Company of North Carolina, and the acquisition of the business by the R. J. Reynolds Tobacco Company of New Jersey in 1899. These averments, which are practically unchallenged by the answer, save that the legality or the validity of the conveyance from the North Carolina Company to the New Jersey Company is denied as violative of the anti-trust act. are amply sustained by the conveyances, of which copies are annexed to the affidavit of Richard J. Reynolds as exhibits 1 to 11, inclusive. Exhibit 1, Copartnership articles, dated January 2, 1888, between Richard J. Reynolds, W. N. Reynolds, and Henry Roan; the former retaining the ownership of all brands. Exhibit 2. Articles of incorporation of R. J. Reynolds Tobacco Company of North Carolina, dated February 11, 1890, showing R. J. Reynolds, W. N. Reynolds, and Henry Roan, taking all the shares of stock. Exhibit 3. Deed from R. J. Reynolds to R. J. Reynolds Tobacco Company of North Carolina, conveying the factory, fixtures, furniture, and brands. Exhibit 5. Articles of incorporation of R. J. Reynolds Tobacco Company of New Jersey dated April 3, 1899. Exhibit 6. Resolution of stockholders of R. J. Reynolds Tobacco Company of North Carolina, authorizing the directors to sell and convey as of March 21, 1899, the good will, business, trade-marks, brands, patents, trade-secrets, processes, formulas, bills and accounts receivable, real estate, factory, plant, machinery, and all assets and property of the North Carolina Company to the R. J. Reynolds Tobacco Company of New Jersey. Exhibit 7. Resolutions

of board of directors of North Carolina Company April 10, 1899, authorizing such transfer. Exhibits 8 and 9. Deeds of factory from R. J. Reynolds and North Carolina Company to New Jersey Company, dated January 30, and April 11, 1899. Exhibit 10. General conveyance April 11, 1899, from R. J. Reynolds Tobacco Company of North Carolina and its stockholders, to R. J. Reynolds Tobacco Company of New Jersey, conveying the tobacco manufacturing business of vendor as a going concern with all good will, personal property, chattels, trade-marks, trade-names, brands, labels, copyrights, trade-secrets, etc., and all property effects, assets, and estate of vendor. Among the registered brands scheduled as "Schnapps." Exhibit 11. Separate transfer, dated April 11, 1899, of registered trade-marks and brands, enumerating Schnapps as registered April 22, 1884. The defendant seeks to show that the complainant is not the legal owner of the Schnapps tag, and, in support of this contention, it is insisted that the conveyance from the North Carolina Company to the New Jersey Company is violative of the anti-trust act.

In order to sustain the proposition contended for by defendants, it must first appear that the contract is in restraint of trade, and it must also appear that it is in restraint of interstate commerce or trade. It has been repeatedly held that a clause of this description in a conveyance of property which includes good will, trade-marks, trade-secrets, and letters patent, is perfectly valid, and not in restraint of trade at all, and clearly a clause of this character does not so directly affect interstate trade or commerce as to be within the statute, even if it were in restraint of trade. The questions thus sought to be raised do not apply in a suit of this character. While the court is of opinion that the evidence amply shows that the contract entered into between the R. J. Reynolds Tobacco Company of North Carolina and the R. J. Reynolds Tobacco Company of New Jersey in 1899, is not in violation of the anti-trust act, at the same time, it is admitted that the complainant is in the possession of the trade-mark "Schnapps," and the label, and that it has been in possession of the same for a long time under color of title and right. It necessarily follows that it is in the rightful possession of the same. It is a well-settled principle that, as against a trespasser, possession of the premises is sufficient.

The tag which is asked to be protected having been adopted in 1894, while the trade-mark Schnapps was owned by the R. J. Reynolds Tobacco Company of North Carolina, and it appearing that all of the business and assets have been transferred to complainant, this would be sufficient without a specific assignment of the trade-mark to give complainant a perfect title to all rights pertaining to the tag. Pillsbury v. Pillsbury-Washburn F. Mills Co., 64 Fed. 841, 12 C. C. A. 432 ; Prince Co. v. Prince Co., 57 Fed. 938, 6 C. C. A. 647 ; Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769 ; Hoxie v. Chaney, 143 Mass. 592, 10 N. E. 713, 58 Am. Rep. 149. The evidence shows that Schnapps tag has been constantly used and employed since April, 1899, by complainant and such use was long prior to the adoption of the Traveller tag. It thus appearing that the North Carolina Company has ceased to use the Schnapps tag, under these circumstances the complainant acquired title to the same independent of any conveyance that may have

been made to it by the North Carolina Company. Baking Powder Co. v. Raymond (C. C.) 70 Fed. 376, two cases.

The court will now consider the question whether the adoption of the Schnapps tag in shape, size, and color of same were in combination new, peculiar, and distinctive.

The verified bill of complaint on page 6, among other things, alleges:

"In the year 1894, while the said R. J. Reynolds Tobacco Company of North Carolina was the owner and proprietor of said business, and was engaged in the manufacture, exploitation, and sale of plug tobacco under said secret formula and recipe at said plant and place, and employing the said trade-mark and trade-name thereon, said R. J. Reynolds Tobacco Company of North Carolina did devise, and thereforth use and employ, in connection with said trade-mark and trade-name, Schnapp, a new, peculiar, original, and theretofore unused tag exhibiting a new, peculiar, original and theretofore unused form and combination of color, shape, and size, and color, and style of letterpress, wherein the word 'Schnapp' was printed in red back-slanting letters upon a very dark or black tin tag of rhomboidal form. Said form of letterpress, and color of type, and color and form of tag were new, original, striking, and distinctive, and not theretofore used or employed upon or in connection with plug tobacco."

R. J. Reynolds says in his affidavit:

"When, in 1894, the Schnapp tag was changed and the present style adopted, this style, so far, as I then knew, or now know, was absolutely new and original. I had been selling, manufacturing and dealing in plug tobacco at that time for a period of over 20 years, and was well posted as to the style of tags employed. Prior to that time, I never saw or heard of a tag of this description; that is, an elongated lozenge or parallelogram, with slanting ends, dark background, and the name of the brand in red letters inscribed thereon. This tag was devised for the express purpose of identifying. and distinguishing the manufacture of the R. J. Reynolds Tobacco Company, and from the beginning was extensively advertised for that very purpose."

W. V. Birchfield, after stating that he has known the Schnapps brand for 12 or 14 years, says:

"The tag in its present form was adopted in 1894. When I first became acquainted with the brand, it was new and distinctive, and I cannot remember of ever having seen anything like it on plug tobacco."

Tom Morton, who has been in the tobacco business in the South since 1889, and is familiar with brands, says:

"When I first saw the Schnapps tag, it was to me new, peculiar, and distinctive in shape and colors, and was, so far as I know, new and peculiar to the R. J. Reynolds Tobacco Company."

W. Z. Stultz says:

"I am well acquainted with the Schnapps brand, and knew it prior to 1894, when the present form of label was adopted. So far as I know, the combination of shape of label, color of label, and color and slant of letters, was new and original."

George P. Cornell, Jr., says:

"I have known Schnapps brand since about 1894. In 1894 a new tag of the present form was adopted. Prior to that time I never saw a similar tag."

R. U. Falkner says:

"That the present form of Schnapps, when adopted in 1894, was new and original, and affiant had never seen anything like it before."

W. T. Brown, of Brown Bros. Company, is familiar with plug tobacco brands and has known Schnapps since its appearance on the market, and knew of the new tag adopted in 1894, and says:

"That at the time of the adoption and placing upon the market of the present Schnapps tag, its design and combination of shape, color, and color of letters a distinctively original and new tag."

Geo. T. Brown, president of Brown & Williamson Tobacco Company, of Winston-Salem, N. C., who has been manufacturing and selling plug tobacco in Southern states for 12 years, and who has known the brand Schnapps since put on the market says:

"The tag adopted in 1894, was in design and combination of shape, color, and color of letters, new and original."

E. M. Bohannon, of Winston-Salem, has been a manufacturer and seller of plug tobacco in the South for 18 years and has known Schnapps from its origin, gives the same evidence as to the newness and originality of the Schnapps tags. W. A. Whitaker, of Winston-Salem, who has made and sold plug tobacco for 25 years, says the same thing. So do J. P. Taylor, a member of the firm of Taylor Bros., manufacturers, and C. D. Ogden, of Ogden Hill & Co., both of Winston-Salem, after an experience as a manufacturer of plug tobacco of 25 years' duration. The peculiar and distinctive tag for Schnapps has been extensively advertised and used, and is now thoroughly associated with and identifies the R. J. Reynolds Tobacco Company's product. Bill of complaint (page 96) affidavit of Richard J. Reynolds, and exhibits thereto. The evidence shows that over 783,676,524 tags have been used upon the plugs sold since 1894. This advertisement and association of the peculiar and distinctive tag as a badge of identification is stated in the bill of complaint, and abundantly sustained by the proof.

R. J. Reynolds says:

"It is safe to say that since the adoption of the new form of Schnapps tag in 1894, the R. J. Reynolds Tobacco Company of North Carolina and the R. J. Reynolds Tobacco Company of New Jersey, has expended the sum of $1,000,000 in advertising Schnapps tobacco, of which sum the advertising matter which reproduced the Schnapps tag. During the same period 83,773,776 pounds of Schnapps, bearing 783,676,524 tags, have been sold."

The exhibits of advertising matter reproducing the 1894 Schnapps tag are exhibit 13, May 6, 1901, 50,000 copies; Exhibit 14, May 15, 1901, 25,000 copies; Exhibit 15, August 17, 1901, 50,000 copies; Exhibit 16, March 20, 1902, 100,000 copies; Exhibit 17, store signs, showing caddies and tag; April 19, 1902, 50,000; October 8, 1902, 50,000; Exhibit 18, April 11, 1902, 20,000 copies; Exhibit 19, July 19, 1902, 50,000 copies; October 16, 1902, 50,000; February 2, 1903, 100,000; April 6, 1903, 50,000; Exhibit 20, June 20, 1903, 50,000 copies; August 19, 1903, 50,000 copies; Exhibit 21, November 14, 1903, 42,000 copies; Exhibit 22, April 20, 1904, 100,000 copies; Exhibit 23, February 16, 1904, 100,000 copies; Exhibit 24, January 30, 1904, 500,000 copies; Exhibit 25, April 30, 1904, 100,000 copies; Exhibit 26, before 1900; Exhibit 27, before 1900; Exhibit 28, issued 1901; Exhibit 29, prior to 1900; Exhibit 30, issued in 1898 or 1899;

Exhibit 31, issued several years since; Exhibit 32, 1895 or 1896; Exhibit 33, issued in 1901. These signs and hangers were distributed all over the South. In 1899, Exhibit 34, showing Schnapps tag on cover was extensively distributed. In March, 1903, Exhibit 35, a pamphlet, showing tag reproduction was issued to the extent of 1,000,-000 copies. Keeping in mind the enormous sales, and that all of the mass of advertisement was of a permanent character, and hung up in public places, and that the prominent and striking features were in most instances of advertising, and in all instances of sales, the tag itself, it necessarily follows that the tag, original, individual, and peculiar, became closely associated with the product in the minds of buyers.

W. V. Birchfield says that the tag from its adoption has served to identify the tobacco, and adds:

"From the earliest date of my experience, the people identified the product by the peculiar shape and style of this tag. I know there are thousands of people in my territory who chew Schnapps, and identify it by the shape and color of the tag without being able to read the word Schnapps."

Tom Morton, after stating that he has noticed throughout the South for a great number of years the advertisements reproducing the tag, says:

"Beyond question this peculiar tag is thoroughly identified with and identifies and designates the tobacco of the Reynolds Company, and the people rely on the shape, color, and arrangement and the general appearance of the tag as identifying that tobacco, as well as the word 'Schnapps' itself. This is particularly true of many of the consumers of plug tobacco. Of these a great many are ignorant people who cannot read, and who depend upon not the printed name, but simply the general appearance of the tag as identifying the tobacco asked for."

W. Z. Stultz says:

"I know that this label in its general appearance is thoroughly identified with the Schnapps brand of tobacco, and is relied upon by purchasers as identifying the thing that they want."

Geo. P. Cornell, Jr., says:

"I know that the people rely on the general appearance of this tag as identifying the goods."

In order to properly determine the merits of this controversy, it is well to understand what it takes to constitute unfair and fraudulent competition in trade. The complainant seeks to enjoin the defendant from the use of a tobacco tag known and designated as "Traveller," which it alleges has been used by the defendant in an unfair and fraudulent manner in the manufacture and sale of plug tobacco. The title of complainant to the Schnapps tag is clearly established, as will appear by the statement of facts in this cause. It appears from the evidence that Geo. T. Brown, Wm. T. Brown, F. M. Bohannan, W. O. Whitaker, J. B. Taylor, and C. D. Ogburn, rival manufacturers, and not all interested in the result of this suit, without exception, state that, owing to the extensive reproduction of the tag in advertising Schnapps brand and tag it had become generally understood on the part of the public as well as dealers that the Schnapps brand was and is associated and identified as the product of the R. J. Reynolds Tobacco Company.

The extensive advertising of this particular brand, and the familiarity with the tag on the part of the public, and the further fact that complainant's goods are known and identified thereby, will be presumed in law from the undisputed facts shown by the testimony as to extensive advertising, long use, and extensive sale.

The New England Awl Co. v. Mar.borough Awl Co., 168 Mass. 154, 46 N. E. 386, 60 Am. St. Rep. 377, was a suit for the protection of a bronze colored box. The court, among other things ruled:

"The report states that it did not appear whether or not any purchaser of awls had learned to recognize the plaintiff's awls by the appearance of the packages. This cannot mean more than that there was no direct testimony to that effect. But the fact that the plaintiff had used the combination since 1885, and largely since 1893, is enough to raise a presumption in its favor. McAndrew v. Bassett, 4 De Gex. J. & S. 380."

It appearing that the Schnapps style of label is identified with complainant's product and that it has a trade or secondary meaning, it will in equity be protected from imitation. The theory upon which the ruling in cases like this is based is that where one adopts a means of advertising, new and peculiar, and has extensively advertised and used the same for a considerable period of time that he thereby becomes the owner of the good will and particular trade in which he is engaged and no one can legally by fraud or falsehood deprive him of the proprietary interest thus acquired, and it being made to appear to the satisfaction of the court that the right thus acquired is being interfered with by trick, artifice, fraud, or falsehood by those who come in competition with him in the sale of his product, a court of equity will by injunction prevent such interference upon the ground that it constitutes unfair and fraudulent competition in trade. The following cases clearly establish the principle that if a manufacturer has adopted a new, peculiar and distinctive label, for the purpose of designating his goods, and the evidence shows that he has used it—his goods being identified by it—a court of equity will restrain another party from adopting and using a similar label arranged so as to mislead purchasers who exercise ordinary care in the purchase of such articles.

In Morrison v. Case, 9 Blatchf. 548, Fed. Cas. No. 9,845, in speaking of the name and figure of a star employed in connection with shirts, it was said:

"Though this device or mark is in part arbitrary and, to that extent, would have no natural or necessary significance in that connection with the article manufactured, apart from its use in that connection, yet, by such use of the plaintiffs' in connection with their manufacture and sale of these articles, it has become well known to the trade, and has come to be taken by dealers as a peculiar designation by which the plaintiffs' goods are distinguished in the market. It is therefore, both in its character and use, when taken together, a lawful trade-mark. It has long been employed by the plaintiffs, and well understood, by dealers and the public, as designating such articles of their manufacture."

In Anheuser-Busch Brewing Ass'n v. Clarke (C. C.) 26 Fed. 410, it was said in reference to a red diagonal band or label used upon a bottle of beer:

"The general rule of law applicable to this case is that, if a manufacturer has applied a peculiar and distinctive label to design-.ie his goods, and has

so used it that his goods are identified by it, a court of equity will restrain another party from adopting and using one so similar that its use is likely to lead to confusion by purchasers exercising the ordinary degree of caution which purchasers are in the habit of exercising with respect to such goods. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828. The complainant's affidavits show that the complainant was the first to use for bottled beer a label with a diagonal red band, with the name of the kind of beer appearing in white letters on the red band, and that he had been habitually using this label for two years. The label is very noticeable and distinctive; one by reason of the diagonal red band. The result of the effect upon the eye from seeing a number of bottles is that it is a beer labeled with a diagonal red band, and the more frequently one sees it the more this one effect is deepened. It does appear altogether probable that a consumer who has been accustomed to getting bottles labeled with complainant's label would more and more rely on the diagonal red band as its distinctive mark, and would be likely to accept the respondent's beer with his diagonal label on it as supplying what he was in the habit of getting. There is nothing in the differences in the labels calculated to counteract this; and, I think, it is a strong case of a similarity likely to deceive."

In Hires Co. v. Consumers Co., 100 Fed. 809, 41 C. C. A. 71, where the defendant had first adopted, advertised, and used for root beer a certain form of bottle, it was said:

"It was proven that the complainant's root beer was principally known to and recognized by consumers from the peculiar form of bottle. It was this distinguishing feature which caught the eye, and abided prominently in the memory. Indeed, the court below declared in its opinion that the changes made by the defendant in its label tended to deceive, 'when taken in connection with the shape of the bottle,' thus clearly recognizing the fact that the form of the bottle employed was an effective factor in the deception practiced."

In case of Elgin National Watch Co. v. Illinois Watch Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365, where the controversy was over the word "Elgin" as a trade-mark, it was held incapable of protection as a trade-mark, but the court declared:

"But when an alleged trade-mark is not in itself a good trade-mark, yet the use of the word has come to denote the particular manufacturer or vendor, relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense by such limitations as will prevent misapprehension on the question of origin. In the latter class of cases such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of. Lawrence Manufacturing Co. v. Tennessee Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997; Coats v. Merrick Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118."

In Walter Baker & Co. v. Puritan Pure Food Co. (C. C.) 139 Fed. 680, it is said:

"Evidence has been introduced to show that complainant has constantly used its trade-mark or emblem since about 1875, and at enormous expense has thus advertised its product in the leading newspapers and periodicals published throughout the United States and Canada. As a natural result thereof, complainant's appropriation, not only attracted the attention of the public generally, but was the means of identification of its chocolates and cocoa by the consumer. That such chocolate and cocoa is frequently purchased and designated by the buyers as 'the cocoa with the picture of the woman or girl,' or 'the chocolate with the picture of the lady,' is abundantly established by the evidence. Hence, it cannot be successfully controverted that complainant's chocolate and cocoa, irrespective of the words 'Walter Baker & Co.' printed upon

the labels, became and were distinctly known and identified by its trade-mark. The full enjoyment of such reputation and means of identification by complainant is unmistakably entitled to protection. The fact that its product is also known or identified by the name of 'Baker,' or 'Walter Baker's Chocolate or Cocoa,' is not material. The purchaser is entitled to receive the commodity which he desires and intends to buy, although other persons may know it by different marks of identification or accessories."

In the case of Johnson v. Seabury & Johnson (N. J. Ch.) 61 Atl. 5, it is said:

"Every case of this class must be dealt with according to the facts in each, having in mind the rights of the public as well as those of the parties.   In the case under consideration the complainant, by conspicuous and continued use of, and by extensively advertising its goods under, the red cross symbol, so impressed the public that it came to rely upon the red cross as indicating complainant's goods, and to look upon the red cross symbol as an indicia of origin; and from this grew the habit of the consumer, when desiring complainant's goods, to call for 'Red Cross Cotton,' as in a similar manner was supplied the word 'Angostura' in Seigert v. Finlaier, 7 Ch. Div. 801, so that, by the act of the public these words became the usual designation of the article, which the court will protect.   Levy v. Waitt, 61 Fed. 1008, 1011, 10 C. C. A. 227, 25 L. R. A. 190."

The Schnapps brand is not claimed by complainant to be a trade-mark, nevertheless complainant is entitled to protection against any imitative device or style of dress which enables the substitution of another's product.

In the case of Shaver v. Heller & Merz Co., 108 Fed. 825, 48 C. C. A. 48, 65 L. R. A. 878 (Circuit Court of Appeals, Eighth Circuit), Judge Sanborn, who delivered the opinion of the court, in discussing this proposition, among other things, said:

"Another proposition of counsel for the appellants is that the appellee has, and can have, no proprietary interest in the word 'American,' or in its exclusive use; and therefore it is entitled to no injunction to restrain its use by another.   But an ownership, and an interest in the means by which a fraud or wrong is about to be committed are not essential to the maintenance of a suit to enjoin its perpetration.   A title to the property about to be injured is sufficient.   One gathers the seeds of pernicious weeds, and threatens to sow them on the field of his neighbor.   The latter has no proprietary interest in the seeds; but he owns the field, and the crop it is producing, an these facts are sufficient to warrant any court in granting him summary relief by injunction against the threatened injury.   The appellants scatter throughout the land for the purpose of deceiving the public and diverting to themselves the trade, custom, and the good will of the appellee, words and names which convey false statements that the goods they are selling were made by the Heller & Merz Company.   That company has no property in the words or in the means by which this fraud is committed, but it owns the good will—the custom—which the false and fraudulent use of these words and names injures and destroys: and its proprietary interest in this good will is ample to warrant the court in enjoining its destruction by the fraud.   The contention of counsel for the appellants here is a confusion of the basis of two classes of suits—those for infringements of trade-marks, and those for unfair competition in trade.   Suits of the former class rest on the ownership of the trade-marks.   Suits of the latter class are founded upon the damage to the trade of the complainants by the fraudulent passing of the goods of one manufacturer for those of another. In the former, title to the trade-marks is indispensable to a good cause of action: in the latter, no proprietary interest in the words, names, or means by which the fraud is perpetrated is requisite to maintain a suit to enjoin it.   It is sufficient that the complainant is entitled to the custom—the good will—of a business, and that this good will is injured, or is about to be injured, by the

palming off of the goods of another as his. Lee v. Haley, 5 Ch. App. 155; Flour Mills Co. v. Eagle, 86 Fed. 608, 30 C. C. A. 386, 41 L. R. A. 162; Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118."

In Reddaway v. Banham, 13 R. P. C. 218, a suit was instituted for the purpose of securing protection for the words "Camel Hair" which were used as the name of belting which constituted about 60 per cent. of camel hair. The evidence in that case showed that the words "camel hair" had by long use by the complainant acquired a secondary meaning and to signify his goods. The court, in discussing this proposition, said:

"I think the fallacy lies in overlooking the fact that a word may acquire in a trade a secondary signification differing from its primary one, and that if it is used, to persons in the trade who will understand it, and be known and intended to understand it in its secondary sense, it will none the less be a falsehood because in its primary sense it may be true."

And, in discussing the doctrine of unfair competition in trade, the court said:

"I have often endeavored what I am going to express now (and probably I have said it in the same words, because it is very difficult to find other words in which to express it), that is, that no man is entitled to represent his goods as being the goods of another man; and no man is permitted to use any mark, sign or symbol, device or other means, whereby, without making a direct false representation of himself to a purchaser who purchases from him, he enables such purchaser to tell a lie, or to make a false representation to somebody else who is the ultimate customer."

In the case of Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847, it is said:

"There can be no question of the soundness of the plaintiffs' proposition that, irrespective of the technical question of trade-mark, the defendants have no right to dress their goods up in such manner as to deceive an intending purchaser, and induce him to believe that he is buying those of the plaintiffs. Rivals manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents, but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals."

Counsel for defendant cite the case of Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847, in support of their contention, but a careful reading of the same shows that, instead of sustaining the views urged by the defendant, it rather tends to support the theory upon which this suit was instituted. Counsel for defendant also rely upon the case of Centaur Co. v. Marshall, 97 Fed. 791, 38 C. C. A. 419, the court said:

"The intention on the part of an alleged infringer to induce purchasers through the use of simulated trade-mark or dress, to buy his goods under the belief that they are another, furnishes no ground for relief, unless the similarity between the two trade-marks is of character to convey a false impression to the public mind, * * * and to mislead and deceive the ordinary purchaser."

In that case it was held that, while there were elements in both labels that were common, yet inasmuch as there were many distinguish-

ing elements, and each manufacturer put its name on the labels, so that any one who desired to look and see could do so, that was sufficient. Relief was denied. It necessarily follows from the quotation in the case, supra, if the labels had been without distinguishing features save the name employed, a different conclusion would have been reached by the court. In the case at bar the defendant adopted and used a similated trade-mark or dress which was calculated to convey a false impression to the public mind, "and to mislead and deceive an ordinary purchaser."

Again, in the case of Heide v. Wallace & Co. (C. C.) 129 Fed. 649, and Id., 135 Fed. 346, 68 C. C. A. 16, relied upon by counsel for defendants. In the former case, it is said:

"This device stamping or embossing the monogram has been employed for the purpose of marking their goods by others in the same trade, including the defendants, fully as long, if not longer, than the complainant."

The language used by the court in the above paragraph is sufficient to distinguish that case from the one at bar. The evidence in that case clearly shows that the device employed in marking the goods by others than the complainant had been in use by them as long, if not longer, than the complainant. Complainant was, therefore, met at the threshold of the proceeding with an insuperable barrier which he could never overcome in a suit of this character.

Again, referring to the diamond form and lettering, the court said:

"Furthermore, except as these so-called pastilles are sold in bulk, neither the form nor the lettering is brought to the attention of purchasers until after they have bought them; and while both, no doubt, even so, might aid in an intended deception, it has to be initially induced and practically accomplished by the outside of the package, as addressed to the eye of the customer, which is thus controlling."

This is sufficient to differentiate that case from the one at bar.

In the case now under consideration, the tag on the plug of tobacco may be seen when the purchase is made, and before the purchaser asks for the article. The court, in continuing the discussion, among other things, said:

"The case, in this view, is brought down to the use by the defendants of the words 'Liquorice Pastilles,' and the manner they have taken to dress their packages."

From this quotation, it appears that the words "Liquorice Pastilles" are descriptive and in common use, and hence no right exclusive or otherwise obtainable therein; and the court, in conclusion, said:

"In the face of this demonstration, it cannot be successfully contended that the term 'Liquorice Pastille,' which has been in such long and familiar use, is distinctive of the plaintiff's manufacture."

The court also said:

"It is only when he adds his name and trade-mark that we have anything that is, and these the defendants in no way imitate. Neither do they the style or coloring with which he dresses out his package. This is in mixed red and blue, set off in gilt, with the diamond trade-mark prominently displayed; while the defendant's package is predominantly yellow, with an entirely different style of lettering in red, shaded with white on a black background, with their name written below."

These statements taken from the opinion in that case fully differentiate it from the case at bar, leaving the proposition upon which plaintiff relies for relief in this instance, not only unaffected, but to a certain extent sustained, thereby; the theory in that case being that the shape and size of the boxes were common to the trade, and not susceptible of a monopoly. It was also held that the boxes not being the same in coloring and marking, it was not likely that a customer of ordinary intelligence would be misled or deceived thereby.

In the opinion of the Court of Appeals, where this case was heard, the court, among other things, said:

"There is nothing whatever to suggest an attempt to catch the unwary purchaser and inveigle him into taking the one when he was seeking the other, nor could the most careless be deceived, except he was in reality unconcerned as to which he got."

The inference to be drawn from the opinion in that case is that, if the colors of the boxes labeled by defendant had been similar to those of complainant, the complainant would have been entitled to relief. The use of distinctive colors, together with the arrangement upon the exterior of the boxes, and the use of the respective manufacturers' names, were deemed insufficient by the court to justify the relief sought, upon the theory that the name "Pastille," and size of the packages were old and known to the trade, and the use of the same was a right that was common to all persons engaged in the mercantile business. How different are the facts in the case at bar. Here, we have a tag which has been adopted and used by the complainant consisting of a peculiar background, the use of the word "Schnapps" on slanting letters, and the tag being rhomboid in shape. This tag, as stated, has been extensively advertised throughout the country, and, as a result of which, has become identified with the particular grade of tobacco sold by complainant, and has been used by the public to such an extent that such brand has established a reputation by virtue of the means thus employed to identify and advertise the same. The evidence shows conclusively that the R. J. Reynolds Tobacco Company conceived the idea of placing upon the market a certain grade of tobacco stamped with the word "Schnapps" as a means of identifying and advertising the same. It appears that about $1,000,000 have been expended by this company in advertising this particular product; as a result of which, it has become well known and identified as a particular brand of chewing tobacco.

While the elements taken as a whole constitute entirely new and distinct features unknown to the trade prior to the adoption of this particular brand, at the same time, the different elements thus combined, when considered separate and distinct the one from the other, do not constitute an element new and unknown to the trade. Therefore, it is the result of the combination, letterpress, background, color, size and form of tag which give to the label of complainant features that are separate, new, and distinctive and which were unknown to the trade at the time of its adoption. The principle invoked by complainant is well defined, and is governed by a long line of decisions intended to secure fair and impartial dealings, among those who may seek to place their goods, wares, and merchandise on the market.

The evidence of Tom Morton, reading at Memphis, Tenn., is, that while he was engaged in selling the product of the defendant that the brand of Traveller was adopted solely with the view of enabling the defendant to find a ready market for this kind of tobacco which the defendant at that time was exceedingly anxious to introduce as a new brand of tobacco. The testimony of this witness shows that it was agreed that a tag should be used of the same size, color of background, type, and peculiar slant of letters as that of Schnapps brand, the only difference being that the word "Traveller" instead of "Schnapps" was to be used on the new brand.

The question involved in this controversy, not only affected the rights of the parties, but the public also. The public, as well as individuals, is entitled to protection from those, who by unfair means and methods seek to palm off an article which is not what it is represented to be. The evidence shows conclusively that the brand known as "Traveller" is an inferior grade of tobacco, sold at wholesale, at a much less price per pound than the Schnapps brand. The adoption of the Traveller brand enabled the defendant to secure an undue advantage over the Schnapps brand in that it was enabled to offer to unscrupulous dealers a cheaper grade of tobacco which was to all appearances of the same grade as Schnapps, labeled with a tag so similar thereto as to deceive the public into purchasing the same, believing it to be the genuine Schnapps brand of tobacco. The cheapness of the grade, and the similarity of the brand both as to shape, size, and lettering, made it possible for the defendant by these means to engage in unfair and fraudulent competition by which it could ultimately drive its competitor out of the market. The adoption of this peculiar device by the defendant enabled it to offer a persuasive argument to the retail dealer by pointing out to him the fact that here was a brand of tobacco; the plug of which was of the exact shape, size, and color, as that of the Schnapps brand, and that the brand thereon similar in shape, size, color of background, and lettering, and which could be placed upon the market at a cheaper price than the Schnapps brand, and in this way supplanting the Schnapps brand by selling what appeared to be the same tobacco at a much cheaper price.

It is insisted by complainant that most of this brand of tobacco was consumed in communities where ignorant white and colored persons, who, being unable to read, relied solely on the general appearance of the brand and size of the plug; but the court is of opinion that this is really not the true test, and does not deem it necessary if such were so, to make the application in this instance, in view of the fact that the similarity of the brands are such that the Traveller brand is calculated to deceive any one of ordinary intelligence who might desire to purchase the Schnapps brand. By placing plugs of the Schnapps and Traveller brands of tobacco along side each other in a storeroom with such light as stores usually have, at a distance of six or eight feet (the distance usually intervening between the place where tobacco is placed on the shelves, and the position occupied by customers), and without a magnifying glass, it would be a physical impossibility for an expert reader to distinguish the one from the other.

We know by observation that the average purchaser of tobacco rarely ever takes time to examine the brand on tobacco before removing the same. The rush incident to the great amount of business that is now being transacted throughout the country renders it quite impossible for the average man to take time to closely scrutinize the brands which may be attached to a particular piece of tobacco which he may purchase. Therefore, the public has come to rely mainly upon the well-established brands for almost every article purchased, and is entitled to receive the same free from deception and fraud. Common honesty, public policy, and every consideration of fair dealing, demand that the public should be protected in this respect. This peculiar brand of tobacco, having been so throughly advertised by all manner of devices, through the public press, bill posters, and cards, has become so thoroughly identified as the product of the R. J. Reynolds Tobacco Company that one who desires to purchase this particular product relies exclusively on the first impression he gains when looking at a caddy of plug tobacco, and does not stop to critically examine the same in order to ascertain whether or not a fraud is being practiced upon him.

That the means employed by the defendant are such as to mislead those who may desire to purchase the Schnapps brand of tobacco cannot be doubted; and it being further shown that the public has been misled by the means thus employed, and inasmuch as it appears from the evidence that the Traveller brand was adopted with the intent of entering into unfair and fraudulent competition with the complainant, the relief demanded will be granted.